Filed 8/29/14  In re D.B. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re D.B., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, Plaintiff and Respondent, v. D.B., Defendant and Appellant. | A140113 (Alameda County Super. Ct. No. C183805) |

**INTRODUCTION**

D.B. (appellant) timely appeals from a juvenile court order committing him to the California Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF) on his most recently sustained Welfare and Institutions Code section 602 petition.[1] He contends the juvenile court abused its discretion in committing him to DJF because there was no evidence a less restrictive alternative placement would have been ineffective or inappropriate and there was no evidence he would benefit from a DJF commitment. He also argues he did not receive all the custody credits to which he was entitled against his aggregated confinement time.  We reject appellant's first contention but find his second contention has merit.  Therefore, we will remand to the juvenile court with

---

[1]  Statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

directions to correct the custody credit determination and modify the dispositional order accordingly. As modified, the juvenile court's orders are affirmed.

## STATEMENT OF THE CASE AND FACTS

### I. Background

Appellant was born in 1996. He was removed from his mother's home in November 2001 due to physical abuse at the hands of his mother and her boyfriend as well as maternal drug use. He was in multiple placements, including his maternal grandmother's home and foster care, before he was returned to his mother's home in July 2004. The dependency was dismissed on July 1, 2005.

He was referred for therapy in 2002 by his grandmother and began seeing a therapist that year. Later that year, at age six, appellant was provisionally diagnosed with bipolar disorder. He was also diagnosed with attention deficit hyperactivity disorder (ADHD), adjustment disorder with mixed disturbance of emotions and conduct, and post-traumatic stress disorder (PTSD). He began treatment with Ritalin and was evaluated for psychotropic medication. Early on, appellant received speech and language services for language delays, but eventually he no longer qualified for them. From first grade, appellant exhibited ongoing behavioral and social problems at school with teachers and peers, although he had strong academic skills. He continued with individual therapy.

### II. First Petition

On March 18, 2009, appellant was charged in an original section 602 petition with the use of force and violence on school grounds against K.T. and simple battery against her, both misdemeanors. (Pen. Code, §§ 243.2, 242)~ Appellant choked K.T. until she could not breathe. He demanded she give him "mustard," which could mean either a Monster energy drink, money, or a kiss. He also pushed her head down to his crotch area and told her, "Give me head." Appellant denied this. Earlier in the school year, he had demanded her lunch money and punched her in the leg.

2

The court placed appellant on informal probation pursuant to section 654.2. The charges were dismissed and informal probation was terminated in December 2009.

## III. Second Petition

On August 4, 2010, a "reopened" section 602 petition was filed charging appellant with robbery, grand theft from the person, and receiving stolen property. (Pen. Code, §§ 211, 487, subd. (c), 496.) In May 2010, appellant was one of a group of approximately five youngsters who walked up to a female Encinal High School student and took her camera, iPod, and earphones from her person before fleeing. The police were called and the victim identified appellant as the thief who took her iPod. He revealed the location of the stolen iPod and the stolen property was recovered. In August 2010, a Toyota Camry was reported stolen to Hayward police. A witness saw two juveniles park and exit the stolen car and called the police, who detained them. The witness identified appellant and another youth as the persons she saw in the car.

On August 12, 2010, appellant admitted count three, felony grand theft, and the remaining counts were dismissed. The court placed him on formal juvenile probation.

## IV. Third Petition

On September 23, 2010, a subsequent section 602 petition alleged appellant committed a first degree burglary. (Pen. Code, § 459.) On September 21, 2010, appellant and another juvenile entered a house and ransacked it. The homeowner returned home while they were still inside; one of the boys ran past her and out the front door. The homeowner called the police and he was soon apprehended. The homeowner identified appellant's co-participant as one of the burglars she saw run out of her home; he later identified appellant.

The charge was reduced to second degree burglary, which appellant admitted. The court placed him at home on formal probation with electronic monitoring. After performing "marginally" on electronic monitoring, the court vacated it and placed him in the Family Preservation Unit.

3

## V.  Fourth Petition

On December 28, 2010, a subsequent section 602 petition alleged appellant, now age 14, committed the offenses of assault with a firearm, negligent discharge of a firearm, carrying a loaded firearm, and lying to a police officer.  (Pen. Code, §§ 245, subd. (a)(2), 246.3, subd. (a), former 12031, subd. (a)(1), 148.9.)  Firearm use and great bodily injury enhancements were alleged in connection with the assault charge.  (Pen. Code, §§ 12022.5, subd. (a), 12022.7.)  Appellant shot his girlfriend in the foot.  The police were called and she was taken to the hospital for treatment.  Appellant gave police a false name and said he found the revolver in some bushes.  He said he shot the gun at the sidewalk but the bullet ricocheted and hit his girlfriend.  He said he did not intend to shoot her.  Appellant gave the gun to another youth to hide. The revolver was found by police in that youth's bedroom closet.

On January 21, 2011, appellant admitted negligent discharge of a firearm and the remaining charges were dismissed.  On February 7, the court reinstated probation and placed appellant at Camp Sweeney.  On April 20, 2011, the minor absconded from Camp Sweeney, but he self-surrendered the next day.

## VI.  Fifth Petition

On May 29, 2011, appellant absconded from Camp Sweeney again.  This time he was charged in a subsequent 602 petition with escape.  (§ 871.)  A warrant for his arrest issued June 10, 2011.  He remained at large for almost two years until his March 1, 2013 arrest at school on the warrant.

## VII.  Current Petition

On March 4, 2013, a subsequent section 602 petition was filed alleging appellant committed attempted murder and assault with a firearm in 2011 while he was at large.  (Pen. Code, §§ 187/664, 245, subd. (a)(2).)

The new case involved events on October 8, 2011.  Police were dispatched to 7th Street in Hayward in response to 911 calls about a shooting that had just occurred.  The

4

victim, F.S., had a wound to his upper left chest area which was being tended by a witness who was also a nurse. One officer knelt down next to F.S. and asked him what happened. F.S. said he was shot by "[D.] Rhodes" with whom he had been having an ongoing argument. Another officer asked F.S. if he was robbed; F.S. said no. F.S. said he and "Rhodes" were going to fight when "Rhodes" shot him with a handgun. F.S. said "Rhodes" lived up the street and that F.S. knew him. F.S. told his mother, who was there, to show the officer a picture of "Rhodes." At this point, F.S. appeared to go into shock, and F.S. said he did not want to die. F.S. was taken by ambulance to Eden Hospital, where he underwent emergency surgery to resection his bowel and repair damage to his spleen and kidney. The surgeon was unable to remove the bullet. It was lodged in his back near his spine and could not be removed safely.[2]

The nurse who tended F.S. saw the shooting and provided a description of the suspect. She said she was driving by the intersection of 6th and B Streets when she saw the suspect and the victim "in some type of argument." "[T]he victim was putting his hands up on the suspect's chest, as if to say wait a min. The suspect knocked the victim's hands down . . . twice." The suspect then reached across his body with his right hand and took a revolver out of his left pants pocket. "The suspect pointed the gun at the victim and hesitated for a second and then fired a shot." The victim almost fell but then ran up B Street. The nurse followed him to 7th Street where she rendered aid on the street.

F.S. reached his house, where his mother and aunt called 911 and also tried to help him. F.S. told both of them "[D.] Rhodes" shot him. F.S.'s mother told the police appellant and her son had been arguing and having problems for the last two months. She had been trying "to mediate the problem" between them with appellant's mother.

An officer created a photo lineup with a subject matching the nurse's description and a similar name, "Devon Rose," in the third position. The nurse identified the picture

_____

[2] The bullet was finally removed in October 2013.

of Devon Rose as having the same nose, chin, and neck as the suspect. F.S.'s mother was shown the same photo lineup and told police that the "[D.] Rhodes" her son knew was not in the lineup. She then showed the police a picture of "[D.] Rhodes" on her sister's cell phone. The photo matched appellant's profile picture on Facebook and his booking photograph from the 2010 shooting of his girlfriend.

F.S. was interviewed by police at the hospital on October 10, 2011. He identified a picture of appellant as the person he knew as "[D.] Rhodes." Appellant and another youth known to F.S. as "Davon H." (hereafter D.N., his true initials) confronted him on the street. Appellant pulled out a small chrome semi-automatic pistol from his waistband and handed it to D.N. who, at "point blank range," fired one shot at F.S. F.S. said he knew appellant as "[D.] Rhodes" for one year. They had been close friends until a fight one month earlier. He did not know D.N. very well but knew who he was because he is always hanging out with appellant. F.S. gave the same statement on October 19, 2011.

Police re-interviewed the nurse, who said "she did not see anyone else associated to [F.S.] or the male believed to be [D.B.]"; however, she recalled there were a couple of people standing across the street. She was shown three photo lineups: one was the original lineup which included a photograph of Davon Rose; one included a photograph of appellant; and one included a photograph of D.N. The nurse was unable to identify anyone.

D.N. was interviewed and denied involvement in the shooting. However, he admitted he was in the area, heard the shooting, and ran away. D.N. was on GPS monitoring through juvenile probation at the time of the shooting. GPS records showed D.N. was at or near the shooting location before, during, and after the shooting, and at appellant's address shortly after the shooting.[3]

---

[3] D.N. sustained a felony adjudication for aggravated assault (Pen. Code, § 245, subd. (a)(2)) in July 2012 and was sent to Rite of Passage (ROP) in Yerington, Nevada in October 2012. He returned home in June 2013.

6

Repeated attempts by the police to contact appellant and his legal guardians met with negative results. It appeared they had moved from their known residence to avoid detection. At an earlier point, appellant's parents reported to juvenile probation that appellant had been killed in a car accident.

Appellant was interviewed by police after his arrest on the warrant. He admitted having a physical altercation with F.S. about a month before the shooting and knowing D.N. He said he was buying candy at a liquor store at B and 7th Streets and heard the shooting. He denied knowing who shot F.S. but maintained he did not do the shooting.

The district attorney filed a motion to declare appellant unfit to remain in juvenile court and a behavioral study was ordered. (§ 707, subd. (c).) The court also referred appellant for a medication evaluation. On March 6, 2013, the psychiatrist noted diagnostic impressions of "Adjustment Disorder with Anxiety, H/O Primary Insomnia R/O Conduct Disorder" and "Educational Issues." Benadryl, Wellbutrin "if S/S persists," and individual therapy were recommended.

## VIII. *The Behavioral Study*

On August 16, 2013, the behavioral study authored by Deputy Probation Officer Lawrence Tsang was filed. Appellant was 17 and a half years old at the time of the study. He denied alcohol use but admitted experimenting with marijuana when he was 11 or 12 years old. However, he did not consider himself "a habitual marijuana user." The report noted appellant had speech and learning issues from first through fifth grades, took Adderall from age 10 to 15 for ADHD, was traumatized by the death of his 10-year-old sister in 2010, and had been shot in the leg in 2011. It summarized appellant's dependency and educational history. It recommended that the court "find the minor not to be fit and proper to be dealt with under the Juvenile Court law" based on five criteria: (1) the degree of criminal sophistication exhibited by the minor; (2) the likelihood the minor would not be rehabilitated prior to the expiration of the juvenile court jurisdiction; (3) the minor's previous delinquent history; (4) the failure of previous attempts by the

7

juvenile court to rehabilitate the minor; and (5) the circumstances and gravity of the offenses alleged in the current petition. The minor "failed" the first, third, fourth, and fifth criteria.

With respect to criminal sophistication, the report noted appellant and the victim were once close friends who had fallen out over a minor dispute about attending a party. Tsang wrote: "This Probation Officer is particularly concerned about the fact that [F.S.] was shot soon after he encountered [D.N.] and the minor. It appears that the shooting was not the result of a heated argument or a physical altercation that became out of control. It suggests that the minor and [D.N.] were ready to shoot [F.S.] when the opportunity arose. When they met on October 8, 2011, [F.S.], the minor and [D.N.] hardly struggled at all. As well, there was no evidence to support that [F.S.] provoked the minor or [D.N.] prior to the shooting. [¶] . . . [E]ven more troubling for this Probation Officer is the fact that, allegedly, the minor passed his handgun from his right hand to his left then to his co-participant, [D.N.]. [D.N.] called out 'point blank range' before shooting [F.S.]. This Probation Officer trusts that the minor and [D.N.] were acting in-concert swiftly. It goes to show that, likely, they had planned the shooting. The October 8th, 2011 shooting of [F.S.] was not an impulsive act of two reckless teenagers, or a mere firearms accident. It appears to be a premeditated and violent way of how the minor intended to settle an earlier dispute among friends."

Tsang found appellant passed the second criterion, regarding rehabilitation before the expiration of Juvenile Court jurisdiction, because of the availability of services beneficial to the minor at DJF. Tsang had contacted DJF and learned the minor's initial parole consideration date would be four years from intake; DJF would maintain jurisdiction until the minor turned 23 years old. Furthermore, DJF "would provide a comprehensive medical/physical/psychological evaluation" and "appropriate evidence-based services such as anger management, substance abuse intervention, vocational counseling, and gang intervention." Also, DJF operated a fully accredited high school

8

where appellant could take advantage of "specialized education services such as Individualized Education Program (IEP)" if needed and earn a high school diploma.

Tsang also spoke with a representative of ROP who was aware of appellant's co-participant, D.N., and "agreed to interview [D.B.] for eligibility of services should the Court order out-of-home placement."

## IX. *The Uncontested Jurisdictional and Contested Dispositional Hearings*

On September 17, 2013, appellant admitted he was "involved in the shooting of [F.S.] as alleged in Count 1 of the petition" (attempted murder). In exchange for the admission, the assault charge and pending probation violations were dismissed, and the fitness petition was withdrawn. Appellant's maximum confinement time in a locked facility was set at 11 years, including time attributable to his prior aggregated admissions.

A contested disposition hearing was held October 9, 2013. The dispositional report, also written by Probation Officer Tsang, covered much of the same ground as the behavioral study. In addition, the minor was assessed for risk of recidivism; his score of 23 placed him in a high-risk category. However, based on "the minor's seemingly positive adjustment following the October 8, 2011 incident, the minor's placement options, [and] the importance of reconnecting the minor with his family," Tsang and a committee of probation officers recommended placement at Camp Sweeney.

After consideration of the probation report, all the letters of support submitted by family members, school officials, and others, and the arguments of counsel, the juvenile court rejected the recommendation for Camp Sweeney "on a case like this" as "completely inappropriate and almost laughable" in light of appellant's two escapes from the camp.

The court "did seriously consider" an ROP placement and debated "in my mind very, very strenuously both sides of that argument as to whether or not" ROP would be an appropriate placement for the minor. The court had visited ROP and found it "a pretty remote and desolate place" that nevertheless offered "very, very good programs" similar

9

to "the kind of programs that [DJF] also offers." In the end, the court concluded that a DJF commitment was the most appropriate placement for appellant.

The court reasoned: "When an offense like this comes before me where the facts . . . [are] that the minor provided the weapon that was used to shoot this individual, that it appears to have been *premeditated and deliberate because there was some history between the minor and the victim.* And that the minor was going to resolve the matter in the streets . . . as opposed to resolving it in a civilized peaceful manner where both parties can emerge with a compromise that satisfies both and it doesn't involve violence. But that's not what happened here. What happened here is a gun was provided and that gun was used to shoot someone and the consequences were very, very serious. This individual could have died . . . . [¶] . . . Whether [appellant] was the shooter or the person who participated . . . the crime is the same, the culpability is the same. [¶] So, in weighing all of those and considering that the [DJF] was consulted in this case, and the [DJF] did indicate to probation that they could provide services for the minor, . . . he would undergo comprehensive medical, physical and psychological evaluations depending upon those needs, and appropriate evidence based services such as anger management, substance abuse intervention, vocational counseling, gang intervention as well as individualized education programs in a fully accredited high school, all of which are services that they could provide to the minor. I believe that when I weigh the protection of the public as against the minor's needs, *the protection of the public in this case outweighs the minor's needs given the serious nature of the offense.*" (Italics added.)

The court also found the services offered by DJF could benefit the minor, and that the "mental and physical condition and qualification of the minor render it probable that he will benefit from the reformatory discipline or treatment provided by the [DJF]." The court committed the minor to DJF for a maximum confinement time of 11 years with credit for time served of 224 days.

10

## DISCUSSION

### 1. *Propriety of DJF Commitment*

Appellant challenges the juvenile court's order committing him to DJF as an abuse of discretion. He argues that a DJF commitment was neither the least restrictive placement nor one that would probably benefit him. We disagree.

Section 733 provides in pertinent part: "A ward of the juvenile court who meets any condition described below shall *not* be committed to [DJF]: [¶] . . . [¶] (c) The ward has been or is adjudged a ward of the court pursuant to Section 602, and the most recent offense alleged in any petition and admitted or found to be true by the court is *not* described in subdivision (b) of Section 707 . . . ." (Italics added.) Here, the most recent offense alleged in a petition and admitted by the minor is attempted murder, which *is* a section 707, subdivision (b) offense. (§ 707, subd. (b)(12).) Consequently, the minor was eligible for a DJF commitment.

Section 734 provides: "No ward of the juvenile court shall be committed to [DJF] unless the judge of the court is fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the reformatory educational discipline or other treatment provided by [DJF]." (§ 734.)

"A commitment decision is reviewed on appeal for abuse of discretion, indulging all reasonable inferences to support the juvenile court's judgment. [Citation.] 'We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence.' [Citation.] 'A [DJF] commitment is not an abuse of discretion where the evidence demonstrates a probable benefit to the minor from the commitment and less restrictive alternatives would be ineffective or inappropriate.' [Citation.] " (*In re Edward C.* (2014) 223 Cal.App.4th 813, 829.) In short, when the requisite findings are supported by substantial evidence, they will not be disturbed on appeal. (*In re Jose T.* (2010) 191 Cal.App.4th 1142, 1147.)

11

We examine the record in light of the purposes of the juvenile court law. (*In re Jose T., supra*, 191 Cal.App.4th at p. 1147.) Those purposes include protection of the public, as well as rehabilitation of the juvenile offender, including punishment that is consistent with the rehabilitative objectives of the juvenile court law. (§ 202, subds. (a) & (b); *In re Julian R.* (2009) 47 Cal.4th 487, 496.) Citing *In re Teofilio A.* (1989) 210 Cal.App.3d 571, appellant argues that commitment to DJF should be used as a last resort, "only in the most serious cases and only after all else has failed," (*id.*, at p. 578) because it thrusts the minor into custody with the most serious youth offenders in the state, i.e. those having lengthy involvements in violent and illegal activity. However, appellant overlooks his own lengthy and violent record which began at age 13 with a battery with sexual overtones and soon enough involved the accidental shooting of a friend as well as the deliberate and nearly deadly shooting of a former friend. He also overlooks he was placed at home without supervision, at home on formal probation, at home with electronic monitoring, in the Family Preservation Unit, and at Camp Sweeney before commitment to DJF was considered.

Appellant argues there is no evidence that less restrictive alternative placements, including Camp Sweeney, would be ineffective or inappropriate. Here, the record shows the minor had *twice* escaped from Camp Sweeney and that his family of origin, however well-meaning, was not a positive influence in his life. In our view, the juvenile court in this case did not abuse its discretion in concluding a return to Camp Sweeney would be ineffective and inappropriate, the probation department's recommendation notwithstanding.

Appellant also argues the trial court's rejection of an ROP placement was error because the minor had committed no offenses throughout the nearly two years between the October 2011 shooting and his March 2013 arrest during which he was at large after escaping from Camp Sweeney. However, he tested at high-risk for recidivism at the time

of the dispositional report, a fact which the court was entitled to consider in evaluating the most appropriate placement for him.

He also argues the court abused its discretion because it did not fully consider ROP, since the record does not reflect the minor was ever interviewed by ROP, the court over-relied on the serious nature of the offense, and the record does not support the court's findings that the minor would benefit from the programs at DJF. However, the record shows the court was well-acquainted with the programs offered by ROP and DJF, and had before it comprehensive behavioral and dispositional reports that documented in detail the minor's developmental, social, academic, and criminal history. In our view, the court had sufficient information before it to make a rational and informed decision between ROP and DJF as the best placement for the minor.

Moreover, the record supports a finding that appellant had a number of unmet needs and untreated conditions. The record shows appellant had been abused as a small child and exhibited out-of-control anger as early as first grade. He had been diagnosed with ADHD and treated with Adderall for five years. Bipolar disorder was also suspected. He admitted he began using marijuana at a young age. The court had before it ample basis for concluding that the minor would benefit from a current comprehensive medical, physical, and psychological evaluation by DJF designed to rule out or discover the sources of the minor's antisocial behavior, and that DJF could put in place appropriate services which would best serve the minor's needs, including programs to address anger and substance abuse issues as well as vocational counseling. Moreover, the minor stated he wanted a diploma, not a G.E.D., and DJF's high school program is fully accredited and offers a diploma. The court's decision to select DJF as the most appropriate and rehabilitative placement was not undermined by the fact appellant might not need all of the services offered by DJF, such as an IEP or gang intervention.

The court's evaluation of the seriousness of the committing offense is also supported by the record. The behavioral study and dispositional report suggested the

13

shooting was deliberate because it was "likely" planned, given the two minors were acting "in concert swiftly" and were ready to shoot. And, it was premeditated, rather than reckless or accidental, given the prior history of bad blood between appellant and F.S., as well as the lack of provocation or heated argument prior to the shooting. Moreover, F.S. was very seriously injured and could have died. These observations were supported by the police reports and witness statements, and the court did not err by agreeing with Probation Officer Tsang's evaluation of the seriousness of the crime.

It is true the judge said the protection of the public "outweigh[ed]" the minor's needs given the seriousness of the offense, which is not the measure for determining the propriety of a DJF commitment. However, an infelicitous choice of words does not negate the evidence here supporting the court's findings that appellant would benefit from a commitment to DJF and that less restrictive alternatives would be ineffective or inappropriate. We find the juvenile court did not abuse its discretion in concluding that, as between ROP and DJF, the minor's needs and the public's needs would be better served by the minor's placement at DJF. Appellant's history of escalating offenses, despite the juvenile court's best efforts to find effective interventions through less restrictive placements, the seriousness of the committing offense, and the minor's evident need for evaluation and treatment of serious emotional, behavioral, and psychological issues in a secure setting provide substantial evidentiary support for the commitment to DJF.

## 2. *Credit for Time Served*

Appellant argues he did not receive the full number of custody credits he should have received against his DJF commitment, including credits attributable to his aggregated prior petitions. (§ 726, subd. (d); *In re Stephon L.* (2010) 181 Cal.App.4th 1227, 1232.) The Attorney General does not dispute the merits of appellant's claim. Instead, the Attorney General argues the claim is not ripe for review, because appellant

14

did not first ask the juvenile court to correct the credits. (Pen. Code, § 1237.1.)[4] However, as appellant points out, Penal Code section 1237.1 does not apply to juvenile court proceedings. (*In re Antwon R.* (2001) 87 Cal.App.4th 348, 351-352.) Moreover, Penal Code section 1237.1 bars an appeal from an error in credit calculation without a prior request in the trial court only when the credit calculation error is the sole issue raised on appeal. (*People v. Florez* (2005) 132 Cal.App.4th 314, 318, fn. 12; *People v. Jones* (2000) 82 Cal.App.4th 485, 493.) It is not the sole issue on appeal in this case.

Turning to the merits of appellant's claim, we agree the 224 days of custody credits awarded him do not appear to include the time spent in custody on the aggregated prior petitions, or the time spent in juvenile hall after disposition awaiting transfer to DJF. Since the appellate record does not permit an accurate calculation of appellant's total credits, we will remand the matter to the juvenile court with instructions to correctly recalculate his custody credits and modify the dispositional order accordingly.

## DISPOSITION

The matter is remanded to the juvenile court to recalculate appellant's custody credits and modify the dispositional order to reflect the correct number of custody credits. As modified, the juvenile court's orders are affirmed.

_____
Dondero, J.

We concur:

_____
Humes, P.J.

_____
Banke, J.

---

[4] Penal Code section 1237.1 provides: "No appeal shall be taken by the defendant from a judgment of conviction on the ground of an error in the calculation of presentence custody credits, unless the defendant first presents the claim in the trial court at the time of sentencing, or if the error is not discovered until after sentencing, the defendant first makes a motion for correction of the record in the trial court."

15